527 F.2d 177
 1975-2 Trade Cases 60,598
 EMHART CORPORATION, Plaintiff-Appellant,
v.
USM CORPORATION, Defendant-Appellee.
 No. 75--1395.
 United States Court of Appeals,
First Circuit.
 Argued Nov. 5, 1975.
Decided Nov. 7, 1975.
 
 Raymond L. Falls, Jr., New York City, with whom Gaston Snow & Ely Bartlett, Boston, Mass., and Cahill Gordon & Reindel, New York City, were on brief, for appellant.
 Taggart Whipple, New York City, with whom Choate, Hall & Stewart, Boston, Mass., and Davis, Polk & Wardwell, New York City, were on brief, for appellee.
 David F. Cavers, Jr., Robert L. Klivans, Palmer & Dodge and Walter G. Van Doran, Boston, Mass., on brief, for Bernard Patrick McDonough and Alma G. McDonough, amici curiae.
 Before COFFIN, Chief Judge, ALDRICH and McENTEE, Circuit Judges.
 ALDRICH, Senior Circuit Judge.
 
 
 1
 On October 14, 1975, the District Court for the District of Massachusetts issued a preliminary injunction[1] enjoining the carrying out of a tender offer made by appellant Emhart Corporation on September 9, 1975, to purchase from public shareholders of appellee USM Corporation, formerly United Shoe Machinery Corporation, 1,000,000 common shares, at $23 a share. Emhart already owned 1,241,500 shares, and if the tender offer were successful it would possess some 54% of USM's common stock and 43% voting power. The court based its order on its finding that 'the proposed acquisition seems plainly to threaten, if not involve, a violation of the Sherman Act.' On Emhart's appeal extensive briefing was rapidly accomplished. Following argument on November 5 we vacated the injunction, stating that an opinion would follow. As of that date the tender offer, except that it was suspended by the injunction, was still open, viz., until November 10.
 
 
 2
 We need not recite the travel of the case, except to note that the court found relevant earlier stages of the judicial history of USM in another, still open, antitrust proceeding, but which the court declined to consolidate herewith, United States v. United Shoe Machinery Corp., D.Mass., 1953, 110 F.Supp. 295, aff'd, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910, 1967, D.C., 266 F.Supp. 328, rev'd, 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562, hereinafter the Decree case.[2] Without repeating what is disclosed in these decisions, the important substance of which was referred to in its opinion accompanying the October 14 order, the court found therefrom, as brought down to date by extensive submissions made during the present proceeding, that USM has long been the most powerful domestic manufacturer of shoe machinery, and that in spite of 'purgative efforts' in the Decree case to remedy monopolistic practices there found, '(e)very time Antaeus has touched the ground, he has been strengthened.' We by no means criticize the court's metaphor. To adopt it, the question before us is whether further efforts, and particularly the Herculean action now taken, are called for in the present case.
 
 
 3
 The court, of course, did not mean that previous purges had had a negative or reverse effect, or intend to compare USM's shoe machinery manufacturing business with another Herculean antagonist, Hydra. As a result of the original decree USM was reduced from some 85% of the United States market to about 62%. However, this was not enough. The second decree's ordered divestiture brought down its proportion, the court found, to 33%. The court's reference was to the unfortunate necessity of a second order, and also to the fact that, whether 28%, 33%, or 38%, it found the figure has now risen to 42%.[3] USM does have a resemblance to a Hydra, in that to replace what it was required to dispose of by the decree it has taken on many other lines of manufacturing. USM's domestic shoe machinery business, which, from an antitrust standpoint, is all that we are concerned with, now produces only 4% of its total revenues. The court referred to this circumstance, but not, seemingly, as a presently relevant fact.
 
 
 4
 Emhart's business is also diversified. None of it, however, is shoe machinery, or directly related thereto. If what is described as a proposed takeover of USM should be regarded as a merger, it is strictly one between non-competitors. The court's total description of Emhart is as follows.
 
 
 5
 'Emhart is a large diversified company with operations which include the manufacture of glass machinery and machinery of other types. It has a strong capital position with assets in the millions of dollars. It has engineers of experience and research laboratories of importance. Its position is fairly suggested by, if not defined by the fact that its stock is listed on the New York Stock Exchange.'
 
 
 6
 The court did find, however, that the coming together of the two companies as a result of Emhart's stock acquisition, if accomplished, would result in benefits for USM. Largely it put this in general terms, of 'strengthen(ing) the capital position, the resources, the scientific knowhow or . . . other asset(s)' see post, adding that it was 'not prepared to make specific findings which enter into details as to the relationship between the machine shops and skill of Emhart and of United.' It did, however, make particular reference to USM's Beverly plant, as to which USM's brief supplies us with a nickname (the Beverly millstone), alleging that substantial red ink figures have resulted from the fact that it is operating at well below capacity. We read the court's reference as meaning that Emhart could be expected to make use of Beverly, resulting in improvement in its efficiency. USM would put it in much stronger terms, and speaks also of other specific benefits, of which more later.
 
 
 7
 We have no occasion to criticize any of the court's findings, insofar as it made them. Our first inquiry is directed to the use to which the findings were put, what legal standard, what legal provisions, the court applied and relied on. The main thrust of USM's argument below was directed to a violation of section 7 of the Clayton Act, 15 U.S.C. § 18. In the course of the proceedings, however, the court was unimpressed by that approach and called attention both to the Sherman Act, and to the existing decree. In its final opinion there is no reference to section 7. At oral argument we asked counsel whether the opinion relied on the decree as well as on the Sherman Act, receiving a negative answer from Emhart, and, at first, a cloudy answer from USM. Upon it being pointed out that he had told the district court that there was 'no claim whatever' of 'a violation of the decree,' USM counsel left as his final answer that the court 'did not import standards from the decree.'
 
 
 8
 The full question we asked counsel was whether the court relied on the decree, or on the Sherman Act, or joined the decree to the Sherman Act to produce a standard more easily met (by USM) than that of the Sherman Act alone. We are not certain that counsels' disclaimer of the third alternative is correct. During final arguments below, immediately before it announced its opinion, the court expressly referred to the limitations the Supreme Court had placed upon USM's domestic shoe machinery activities.
 
 
 9
 'The concern of the Supreme Court as shown in Mr. Justice Fortas' opinion (391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 ante) has been lest United's power be not sufficiently dissipated.
 
 
 10
 'Were the American Telephone & Telegraph Company or the Rockefeller Foundation--neither of which so far as I know has the slightest interest in shoe machinery manufacture--to acquire a million shares on top of another million shares of USMC, it seems plain beyond the slightest doubt that USMC would be more firmly entrenched than it ever had previously been in the domestic shoe machinery market. It would be even more difficult for an outsider to enter the market and in the situation that would be presented to compete successfully with the company which has this long history of experience, this pool of patents, this group of experts, this history of satisfactory customer relations. And thus it seems to me that the fundamental question in this case is: Is not Emhart like American Telephone & Telegraph or the Rockefeller Foundation in the hypothetical case which I have just suggested coming into a situation where the Supreme Court has sent a flag of warning?'
 
 
 11
 When it came to its opinion the court first recognized that there were many possible benign reasons, economic and otherwise, not related to the presence of, or to any critizable conduct by USM, as perhaps explaining why it was not 'challenged' by greater competition. It then turned, and made the reference to Antaeus, and the historic fact that '(p)urgative efforts . . . have only been moderately successful.'
 
 
 12
 'The remedies of this Court in 1953 proved inadequate. The remedies which followed as the result of the stipulation after the latest Supreme Court of the United States case seem also not to be working in exactly the way that had been forecast. Under these circumstances, it seems too plain to be doubted that anything which strengthens the capital position, the resources, the scientific know-how or any other asset of United must be looked at with a cold eye.
 
 
 13
 'The proposed acquisition by Emhart of another million shares of USMC seems plainly to threaten, if not to involve, a violation of the Sherman Act. Nor can it be doubted that the facts which underlie this conclusion are beyond dispute. There is no testimony that needs to be taken in addition to what has already been recited. There are other matters which supplement these obvious and incontestable recited facts, and without incorporating in this opinion the argument addressed to me by Mr. Whipple this morning, it is enough to say that were this case to go the full way, there might be additional specific points which would further document the conclusion already stated. But since those facts might to some extent be thought disputable, this opinion does not rely upon them.'
 
 
 14
 We have recited this at length both to show the basis of the court's decision, and because we think that, read as a whole, the court very possibly was saying that the existence of the Decree case either reduced the Sherman Act standard, or at the least, made it easier, or more urgent to issue the injunction. We so approach the case, partly because we consider that Sherman Act standards have not been met, and partly because even on a reduced standard we find the court erred in its ultimate conclusion. We do not dismiss as irrelevant appellee's argument, based upon the concept of entrenchment, which has been developed under section 7 of the Clayton Act. The idea of entrenchment refers to unreasonable increases in market power, which is necessarily material to our consideration whether the acquisition violates either the Sherman Act or the decree.[4]
 
 
 15
 We start with two basic facts, already mentioned. First, Emhart itself is a non-competitor in the domestic (or any) shoe machinery business, and there appears no probability of its being found even a potential competitor. There is, thus, no joining of forces in that regard. Secondly, some 96% of USM's activities are now outside the ambit of the decree. These activities are successful. It has never been suggested that this strengthening of its capital position, or these other resources, were in violation of the Sherman Act, or of the decree, viewed singly or collectively; such a suggestion would, indeed, present a novel concept. The court offered no reason, and counsel, since, have furnished no authority, for applying a cold eye, or for considering the situation changed if these outside activities were to be augmented or benefited by infusions, whether by AT&T, or the Rockefeller Foundation, or by Emhart. We would recognize no per se entrenchment in such circumstances, no matter how broadly that doctrine is to be interpreted. The question should be whether it is likely that Emhart's acquisition of USM's stock will lead to specific impermissible conduct of USM's domestic shoe machinery business.
 
 
 16
 USM speaks in terms of entrenchment, but this doctrine requires 'more than simply a showing that the acquiring firm has a deep pocket.' Missouri Portland Cement Co. v. Cargill, Inc., 1974, 498 F.2d 851, 865, cert. denied, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123. The likelihood of specific, anticompetitive advantages must be established. See, e.g., FTC v. Procter & Gamble Co., 1967, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303; United States v. Wilson Sporting Goods Co., E.D.Ill., 1968, 288 F.Supp. 543. To the extent that Kennecott Copper Co. v. FTC, 10 Cir., 1974, 467 F.2d 67, cert. denied, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114, may hold otherwise, we respectfully disagree. We see no basis for an injunction directed broadly to cover as yet unidentified possibilities. Particularly, to say that a company, almost all of whose business has never been found monopolistic, and none of which is presently so found, cannot, by stock purchase, merger, or otherwise, be given general financial support because it might be misapplied, is altogether too drastic.
 
 
 17
 In this posture USM seeks to show threats of specific consequences of the acquisition that would run counter to the decree. We dismiss, as unsupported by any finding of the district court and in no way demonstrated, USM's contention that unlawful entrenchment will result from infusion of Emhart's technological capabilities. Secondly, it may be, although even here the evidence is less than convincing, that because of a possibility of 'rationalization' of machinery (much the same as a morning and evening newspaper using the same presses) or partial rationalization, economies or efficiencies may be achieved that would have the effect of removing the Beverly millstone. Apart from obviating Beverly's deficit, we find no indication that such rationalization would not be primarily for Emhart's benefit, as distinguished from increasing USM's own market power. But we are, in any event, speaking in terms of gains in straightforward efficiency, and not of unfair advantages.
 
 
 18
 USM's brief appears to make a sharper suggestion. Pointing to the fact that it witness, the president of one of USM's principal competitors, testified that 'any problem USM has which has an effect to weaken their competition with us, we are happy about,' its brief can be read as suggesting that eliminating the millstone and otherwise improving USM's cash shortage would be anticompetitive. We could not think that by any interpretation of the Sherman Act, or of the decree, USM is required to maintain its Beverly plant as a deficit operation. We of course agree that a proven monopolist must not be allowed to retain the fruits of his unlawful acts, but we reject any suggestion that a court should force the retention, in the name of social economics, of rotten fruit, if the Beverly plant be such. The entrenchment doctrine properly blocks artificial competitive advantages, such as those derived from certain promotional and marketing techniques, but not simple improvements in efficiency. Compare FTC v. Procter & Gamble Co., with Beatrice Foods v. FTC, 1975, 3 Trade Reg.Rep. § 20,944, See Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev., 1313, 1322--39 (1965).
 
 
 19
 USM seeks to translate even mere gains in efficiency, or any strengthening of its resources as a result of Emhart's acquisition, into violations of the decree because more funds will available for research and development (R & D), arguing that since R & D is essential to its long term capabilities, increasing such expenditures would in itself be anticompetitive. Even if that conclusion be accepted, the availability of funds to engage in anticompetitive activities does not mean that they will be so used. On the record USM finds itself unable to document the imminence of any anticompetitive intention on the part of Emhart. We find no support in the letter which Emhart's president wrote its stockholders with regard to its purchase of USM shares.[5] Manifestly this envisages activities in many directions, almost all of which are inescapably benign. None is identified with any positive objective that could be termed illegal. USM in fact is reduced to complaining that Emhart has been careful to 'cool it' so that nothing improper can be pointed to. This hardly establishes an affirmative case.
 
 
 20
 In sum, while we might well have affirmed injunctive action if the findings supported a conclusion that acquisition of control of USM by Emhart might inevitably, or even more probably than not, lead to conduct forbidden by the decree, we cannot say that by any standard the factual findings of the court, or for that matter, other evidence called to our attention by the parties, are sufficient to support barring the acquisition effort. We could not accept the conclusion that the presence of the decree, and the court's obligation to 'deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future,' United States v. United Shoe Machinery Corp., 391 U.S. at 250, 88 S.Ct. at 1500, requires, or even permits, a court to deny it anything that would merely permit an opportunity to undertake such practices in the future. The decree clipped USM's wings; it did not impose chains.
 
 
 21
 Looking at the question in the large, we consider the fact that USM is subject to the decree, rather than being a ground for apprehension speeding the hand of the court to anticipate possible misconduct, as a safety check, making such conduct less likely to occur. Recognizing that USM is under the eye of the court, Emhart would seem the less likely to cause it to risk censure than if it could count on normal secrecy, and on inertia, whether of the government or of its competitors. We appreciate that questions of allocation of Department of Justice time or resources, or other bureaucratic problems, might make immediate recourse to the court less than certain; nonetheless the prospect of effective court intervention is far more real because of the existence of the decree. By the same token, if the Decree case's lesson proves to have been insufficient, the court, because of its continuing power, is in an exceptional position. If USM's domestic shoe machinery business is so conducted in the future that it requires further divestiture, such can be ordered. If inordinate R & D spending would violate the decree, it can be forbidden. We can agree that an ounce of prevention is better than a pound of cure, but the very fact that cure is available militates against administering a pound of prevention before the patient is sick.
 
 
 22
 Emhart asks that we enter an order finally dismissing USM's counterclaim under which the preliminary injunction was issued. While, for the reasons stated, we see no present probability of USM's success, and accordingly vacate the injunction, we do not believe, on the perhaps incomplete record before us, that we should go further. In the light of our rulings the district court may now find such a disposition appropriate, but that decision should be made first by it. However, if any further preliminary relief of a similar nature is requested, application should be made to us. Cf. Wilson Research Corp. v. Piolite Plastics Corp., 1 Cir., 1964, 336 F.2d 303.
 
 
 
 [1]
 Strictly, there were several parts to the injunction. For present purposes we do not distinguish them
 
 
 [2]
 Emhart, of course, was not a party to the Decree case, and the government is not a party to this one
 
 
 [3]
 In this court Emhart contends that both of the court's figures are erroneous; that the 42% figure is not comparable because it included sales of parts, and that in fact there has been little real change in market share. For present purposes we accept the court's findings without inquiring as to their possible vulnerability
 
 
 [4]
 We also take note of Emhart's argument that the decree should not have been considered to have played any part in the court's decision since the procedural prerequisites to enforcing or modifying the decree were not followed. See 15 U.S.C. § 5. However, to the extent that we interpret the court's order as being supported by the decree, we decline in this case to set aside the order on this basis. Emhart thoroughly participated in the district court proceedings; the interests of the United States were well represented, pro tem., by USM, and there is need for expeditious decision of the merits of this question. No interest, public or private, would be served by washing our hands of any consideration whether the acquisition could be said in a section 5 proceeding to violate the decree. Accordingly, we review the merits to the extent the order could be said to implicate the decree. We recognize that normally in a decree case a court of appeals has no jurisdiction. This, however, is because of felt need for expedition, and not, we believe, because of any supposed incompetence of our court to interpret the decree
 
 
 [5]
 'This brings me to the rationale for this particular investment. USM, a company with sales last year of $634 million and net income of $19.6 million, has extensive world-wide interests and is a company fully compatible with Emhart in numerous ways. Both companies are technologically oriented. Both companies concentrate on serving basic human needs. USM, for example, has been for many years a well known manufacturer of machinery for the production of footwear and is now also a world-wide diversified industrial manufacturer whose products include machinery, industrial and material processing machinery, adhesivers, scalants and coatings, and a wide array of fasteners for the transportation, rubber and plastics, construction and appliance industries
 'We also feel that there are substantial growth possibilities abroad as the combined overseas operations would cover most, if not all, of the major markets for our respective kinds of products.'