**EMHART CORPORATION**

v.

**USM CORPORATION.**
**Civ. A. No. 75-3896-W.**

United States District Court,
D. Massachusetts.

Oct. 21, 1975.

Raymond L. Falls, Jr., H. Richard Schumacher, Cahill, Gordon & Reindel, New York City, Joseph W. Bartlett, Alan Lefkowitz, Gaston, Snow & Ely Bartlett, Boston, Mass., for Emhart Corporation.

Taggart Whipple, Steven F. Goldstone, Davis, Polk & Wardwell, New York City, John M. Hall, Robert S. Frank, Jr., Boston, Mass., for USM Corporation.

## OPINION

WYZANSKI, Senior District Judge.

In its amended complaint filed September 13, 1975 Emhart Corporation seeks a temporary injunction pursuant to Sections 14(d) and 14(e) of the Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78n(d) and (e) and the rules and regulations of the Securities and Exchange Commission, and Section 1651 of the Judicial Code, 28 U.S.C. § 1651.

With respect to the statutory cause of action, this court admittedly has jurisdiction pursuant to Section 27 of the 1934 Act, 28 U.S.C. § 78aa, and with respect to the non-statutory cause of action it has jurisdiction both by virtue of diversity jurisdiction under Section 1332 of the Judicial Code, 28 U.S.C. § 1332 (it being clear that the plaintiff and defendant are incorporated under the laws of different states), and by the doctrine of pendent jurisdiction.

Stated in the most concise fashion, what is involved is a complaint that defendant has misrepresented to its shareholders, of whom Emhart is one, the nature and effect of Emhart's September 8, 1975 tender offer to buy one million shares of USM Corporation's common stock at $23 per share.

USM Corporation (formerly United Shoe Machinery Corporation) is a New Jersey corporation having outstanding approximately 4,143,158 shares of common stock with a par value of $12.50 a share. The corporation has registered such stock pursuant to Section 12 of the Securities and Exchange Act of 1934. Such stock is traded on the New York Stock Exchange.

Emhart is a Connecticut corporation which prior to September 1975 had acquired, and still holds, more than one million shares of USM Corporation stock, which is about 30% of the total USM common stock.

September 8, 1975, Emhart made a tender offer for up to a million shares of USM common stock, which would constitute another 24% of the total number of shares of USM common stock. In that tender offer, Emhart committed itself to purchase each share tendered, up to a maximum of a million shares, at $23 per share, subject to certain terms which need not be here recited. Originally, the offer was to expire on September 19, 1975, but it was extended to October 15, 1975, and again extended to a date in November, 1975.

It is with respect to the action taken by the defendant in advertisements, press releases, telephonic and other communications, and otherwise that Emhart now makes complaint.

For present purposes it is unnecessary to specify in detail every means and method used by the officers and em-

ployees of defendant. It will suffice to recite the more serious matters.

■ *First.* The press releases, advertisements, letters, and other communications by defendant stated that Emhart's tender offer of $23 per share "is quite inadequate" and is an attempt to seize control of USM "at bargain-basement prices."

In one sense such statements were, no doubt, matters of opinion, and had they been made by persons not officially connected with USM would surely not have been deceptive in any sense. However, what the directors and officers of USM knew was not merely what everyone in the general public could have known (for example, that USM stock in the eighteen months preceding the announcement of Emhart's tender offer had never traded higher than at 21½ on the New York Stock Exchange, and had indeed traded at as low as 11½, and that at the close of business on the day immediately preceding the Emhart offer, the price of USM common stock on the New York Stock Exchange was almost $5 a share less than $23). There had been significant negotiations between representatives of Emhart and representatives of USM Corporation earlier in the year 1975 which would have involved a voluntary sale by USM at prices not much higher than $23 a share. Thus in April 1975 USM authorized its representatives to make proposals which involved either the sale of an issue of Emhart subordinated debentures exchangeable for USM's' common stock owned by Emhart at $25 a share, or an exchange offer by an unidentified corporation to acquire USM at a price of $25 per share, consisting of $20 in market value of its capital stock and $5 in cash, in exchange for each share of common stock of USM. Again, in July 1975, representatives of USM met with representatives of Emhart and stated that USM might be interested in making an offer to Emhart to purchase USM common stock owned by Emhart at $25 per share, payable not in cash, but over a period of time.

Furthermore, USM had reported to the S.E.C. that its net earnings before preferred and preference dividends had declined from $4,628,000 for the period ended May 31, 1974 to $3,831,000 for the period ended May 31, 1975, and that its earnings per share had declined from $1.01 for the first quarter of 1974 to $.81 for the corresponding quarter in 1975.

While the USM Corporation reports to the S.E.C. of the declining earnings were perhaps available to the public and had probably been reported in journals handling financial news, there may have been some persons who received USM statements about the $23 tender offer of Emhart who were not aware of the most recent financial data. Moreover, virtually no person not privy to the inside operations of USM would have had any notion that its officers in bargaining sessions with Emhart's officers had apparently been willing to trade on a basis not far distant from the $23 figure which Emhart used in its tender offer.

Under these circumstances, it follows as a matter of fact and as a matter of law that the USM communications which stated that the $23 per share Emhart offer was "quite inadequate" and was an attempt to seize control of USM at "bargain-basement prices" omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading and constituted fraudulent, deceptive, and manipulative practices in connection with Emhart's tender offer and USM's solicitation of securities holders in opposition to that offer.

Such practices constituted a violation of Sections 14(d) and 14(e) of the Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78n(d) and (e).

Such actions also constituted a violation of the fiduciary duties owed by the directors and officers who participated in the aforesaid statements. However, none of those individuals has been named as a defendant, nor does the complaint pray that USM Corporation

should seek to collect reimbursement from any individuals responsible for the expenditure of corporate funds in making by press releases, advertisements, telephone, or other communication the misleading statements.

 Although, were the tender offer unaffected, it might be appropriate for USM to make corrective statements to those who received the earlier misleading statements, since this court has temporarily enjoined Emhart from carrying out its tender, this is not the occasion or the time to give relief in the direction just suggested.

*Second.* Employees of USM in telephonic communications to stockholders made statements which seem to have been misleading with respect to the employees' ownership of stock. While it is quite possible that those communications would require a factual and legal conclusion not unlike that stated under the first part of this opinion, the objections to granting immediate relief apply here as they did above.

 *Third.* The USM releases, advertisements, and other communications gave some indication that the tender offer was inadequate because the amount tendered per share was so much below the book value per share of USM Corporation. However, it is well recognized that book value and market value are not identical and that it is not ordinarily, and in this case it certainly was not, misleading for a company or other person to state that an offer is inadequate because it is far below book value. In such a statement, the communicator and the recipient of the communication must be held to the knowledge that this is merely an argumentative consideration with respect to value, and by no means necessarily a determinative one.

In the present posture of the case, for the reasons indicated primarily at the close of the "First" section above, the prayer for *temporary injunction is denied.*