Larry BERMAN, Plaintiff,

v.

GERBER PRODUCTS COMPANY, George M. Burditt, Dena C. Cedarquist, Harrington M. Cummings, J. Russell Fowler, Arthur J. Frens, Daniel F. Gerber, Floyd N. Head, Richard L. McAuliffe, William L. McKinley, Carl G. Smith, Gloria S. Spitz, John C. Suerth, Raymond A. Weigel and Charles F. Whitten, Defendants.

Mary Oliver SHANNON, Plaintiff,

v.

George M. BURDITT et al., Defendants.

Joan WEISBERG, Plaintiff,

v.

George M. BURDITT et al., Defendants.

LULLABY INFANT'S WEAR COMPANY, INC., on behalf of itself and all others similarly situated, Plaintiffs,

v.

GERBER PRODUCTS COMPANY, INC., et al., Defendants.

Civ. A. Nos. G77–402, G77–404, G77–440 and G77–489.

United States District Court,
W. D. Michigan,
Southern Div.

July 19, 1978.

Rabin & Silverman by I. Stephen Rabin, New York City, De Groot, Kalliel, Triant & Conklin by A. Ray Kalliel, Grand Rapids, Mich., for Larry Berman.

Hillman, Baxter & Hammond, Douglas W. Hillman, Grand Rapids, Mich., for Mary Oliver Shannon; Pomerantz, Levy, Haudek & Block, New York City, of counsel.

Murphy, Burns & McInerney by Gerald F. Burns, Grand Rapids, Mich., William I. Weisberg, New York City, for Joan Weisberg.

Kass, Goodkind, Wechsler & Gerstein by Stuart D. Wechsler, New York City, Shatzkin, Cooper, Labaton, Rudoff & Bandler, Edward Labaton, New York City, for Lullaby Infant's Wear Co., Inc.

Warner, Norcross & Judd by William K. Holmes, Peter L. Gustafson, John D. Tully, Grand Rapids, Mich., for Gerber Products Co.

Cholette, Perkins & Buchanan, Grant J. Gruel, Grand Rapids, Mich., for all defendants except Gerber Products Co.

## OPINION

FOX, Chief Judge.

These actions arise as a result of Gerber Products Company's opposition to a proposed cash tender offer by Anderson, Clayton & Co. Plaintiffs here are stockholders of Gerber. They allege that Gerber's efforts to halt the tender offer violated section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e), (the '34 Act) as well as common law principles of fiduciary duty and various state statutes. They seek damages in excess of $100 million.

On April 18, 1977, Anderson, Clayton publicly announced its intention to purchase through a cash tender offer any and all of the outstanding shares of Gerber common stock at a price of $40 per share, a figure well above the market price for Gerber stock. Anderson, Clayton had informed Gerber management of the proposed offer the previous week, and pursuant to § 14(d) of the Securities Exchange Act of 1934 had filed a Schedule 13D statement containing the terms of the offer with the Securities and Exchange Commission. The Gerber board of directors responded initially on April 18 by declaring that no statement regarding the tender offer would be made until the board met later in the week. On April 20, 1977, the board did meet and issued a press release indicating that it had determined not to recommend the proposed offer to Gerber shareholders. The press release further stated that the board would have an opportunity "to evaluate all possible alternatives" insofar as the offer would remain open for 60 days from its effective date.

On April 25, the Gerber board issued another press release, announcing that it was recommending that Gerber stockholders reject the proposed tender offer by Anderson, Clayton. The release also stated that "the Company will oppose the Anderson, Clayton proposal as not being in the best interests of the Company and its stockholders. Further, the proposed acquisition . . . appears to raise serious questions under the federal antitrust and securities laws, as well as the Michigan take-over statute." On the same day Gerber filed suit in this court seeking to enjoin the tender offer. Gerber's complaint was based on alleged violations of federal securities and antitrust laws. During the next several weeks both the parties and the court spent a great deal of time attempting to produce a workable arrangement with respect to discovery of what Anderson, Clayton called "sensitive payments." One of Gerber's primary allegations was that Anderson, Clayton had not

disclosed in its offering materials sufficient information regarding an illegal payments operation abroad. The basis for the allegation lay in the following background:

In May, 1976, Anderson, Clayton filed a Form 8–K pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. This type of voluntary reporting program was initiated by the SEC in response to the discovery of payments by U.S. corporations to foreign government officials. As an alternative to formal litigation, the voluntary program permits corporations to conduct investigations of their own operations to determine the extent of any improper foreign payments. Anderson, Clayton had commenced such an investigation in early April, 1976. The Form 8–K Report indicated that the investigation had revealed that "there were certain transactions in connection with foreign sales and operations which involved payments to agents under circumstances where it is reasonable to assume that the agents used part of such funds to make payments to foreign government officials, although no employee of the Company has actual knowledge that such payments were in fact made." Form 8–K also indicated that "certain directors and officers were generally aware of the practice" of making these "sensitive payments," and that "entries in the Company's records were not fully descriptive of the transactions." Substantially identical disclosures were made in the tender offer materials prepared for distribution to Gerber stockholders.

Gerber contended that disclosure in the tender offer materials of the identities and locations of Anderson, Clayton employees who were involved in the sensitive payments operation is mandated by section 14(e) of the '34 Act, part of the 1968 Williams Act amendment. Section 14(e) makes it "unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made . . . not misleading . . . in connection with any tender offer . . . ." Anderson, Clayton argued that the identities and locations were not material and need not be disclosed. It was deemed sufficient to satisfy § 14(e) that "generic disclosure" had been made including information that foreign payments had transpired, had been covered up on the corporate books, and that some members of management had been generally aware of the practice.

It was within this framework of facts and allegations that the parties were working. Gerber sought discovery of identities and locations of Anderson, Clayton employees involved in the foreign payments operation. Anderson, Clayton opposed such discovery, seeking a protective order preventing Gerber's acquisition of any documents relating to what it referred to as "sensitive payments."

On June 2, 1977, I issued a protective order requiring Anderson, Clayton to produce for copying and inspection any foreign payments documents, but imposing various conditions upon Gerber's dissemination of information contained in those documents. Under the terms of the order, Gerber was required to notify both Anderson, Clayton and the court of any intention to disclose information contained in the foreign payments documents. Upon a motion for a protective order by Anderson, Clayton prohibiting disclosure, I would review the information in camera and make a ruling on the protective order within 48 hours. If I declined to issue the protective order, Gerber would have been free to disclose the information.

Anderson, Clayton disobeyed the protective order and refused to release the relevant documents for discovery purposes.

On June 7, 1977 an order was issued enjoining Anderson, Clayton from commencing its tender offer until it either produced the documents in question or received a favorable ruling from the Sixth Circuit Court of Appeals.

On June 21, 1977 the parties stipulated that (1) Anderson, Clayton would produce the documents pursuant to the June 2 order; (2) Gerber would make no public disclosure of any information regarding foreign payments until after this court's deci-

sion on a proposed motion for a preliminary injunction; (3) Anderson, Clayton would not pursue the tender offer until after a decision on a motion for a preliminary injunction; (4) Anderson, Clayton would dismiss its appeal of the June 7 order. I entered an order which included all stipulations. A hearing for a preliminary injunction was set for mid-September 1977.

On August 1, 1977 Anderson, Clayton announced that it was reducing its offer from $40 to $37 per share, citing as its principal reasons that Gerber's quarterly earnings had dropped significantly and that opposition to the proposed offer had resulted in increased expenses.

On September 14, 1977 I issued an order bifurcating the action into two parts, one involving securities law issues and the other involving antitrust claims. As was stated in that order, the initial thrust of Gerber's complaint involved the securities law question, chiefly the issue of the extent of disclosure of the foreign payments operation. I exercised my discretion to bifurcate this action pursuant to the well recognized policy of judicial economy and diminution of the parties' litigation expenses.

Resolution of the securities law issue could have made it unnecessary to pursue the matter further since it might have been dispositive of the case. The question of full disclosure was clearly the initial cardinal issue. If it were determined that Anderson, Clayton must fully disclose the foreign payments information in its offering materials, and such disclosure did not take place, the tender offer would have been permanently enjoined and there would have been no need to become involved in the complex and time consuming antitrust issue. Moreover, expeditious treatment of the securities claim would have insured that all material information reached the public at the earliest possible time. It was essential for the investing public at large, as well as for existing Gerber shareholders, to possess knowledge of all material facts as soon as possible after the announcement by Anderson, Clayton that it intended to propose a tender offer so that any trading that took place was based on truth and not on rumors or false impressions.

On September 19, 1977, Anderson, Clayton announced that it was withdrawing its tender offer. The parties stipulated that Gerber would voluntarily dismiss its suit without prejudice. The market price of Gerber common stock fell approximately six points, from $34 to $28 per share the day the withdrawal was announced. It has since risen to approximately $33, well above the general price at which Gerber stock traded prior to Anderson, Clayton's entry into the open market to buy about 1 percent of Gerber's outstanding common stock.

As noted above, plaintiffs contend that Gerber's management violated § 14(e) of the '34 Act. Section 14(e) carries over the requirements of Rule 10b–5 into the area of tender offers. The elements of a violation of § 14(e) are identical to those established under 10b–5 with the exception of the "in connection with" clause. *See Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 940–41 (2d Cir. 1969); *Applied Digital Data Systems v. Milgo Electronic,* 425 F.Supp. 1145, 1156–57 (S.D. N.Y.1977). Plaintiffs base their allegations on a number of actions by Gerber's management:

(1) Although the April 20 press release suggested that the board of directors would evaluate all possible alternatives, it failed to do so insofar as any overtures by other companies indicating an interest in acquiring a controlling position in Gerber fell on deaf ears pursuant to an undisclosed policy of resistance to all potential acquisitions.

(2) The board refused to negotiate with Unilever Ltd. regarding Unilever's demonstration of interest in acquiring control of Gerber on a "friendly" basis through a tender offer or other means. No disclosure of such contacts was made by the board until approximately five months later following a newspaper account of such expressions of interest.

(3) The board did not disclose to the shareholders that Gerber's investment banker, Goldman Sachs, had advised that the $40 per share offered by Anderson, Clayton was substantial.

(4) The litigation against Anderson, Clayton was not motivated by legitimate business interests, but rather by the self-serving interests of the individual board members.

(5) The April 25 announcement failed to disclose: (a) why the tender offer was not in the stockholders' best interest in light of the fact that the offering price of $40 per share represented a substantial premium over the market price; (b) the opinion of Gerber's retained investment firm, Goldman Sachs, as to the fairness and adequacy of the proposed tender; (c) whether the board considered $40 a fair price for the stock irrespective of other reasons for recommending rejection of the offer; (d) that the proposed offer constituted a substantial premium over the market price for Gerber stock; (e) that Gerber's last two quarters' earnings were less than the earnings for the comparable quarter in prior years; (f) that it was anticipated that earnings for the first quarter of the 1978 fiscal year would be disappointing.

(6) A June 17, 1977 letter from defendant Suerth, chairman of the board, to all Gerber stockholders reiterating the views of the board with respect to the Anderson, Clayton offer failed to disclose any of the matters set forth in (5), *supra*.

(7) A proxy statement sent to Gerber stockholders repeated the board's recommendation of rejection of the Anderson, Clayton offer but failed to disclose any of the matters set forth in (5), *supra*.

(8) The proxy statement also stated that the Michigan State Court of Appeals had held that Anderson, Clayton's filings in connection with the offer violated the disclosure requirements of the Michigan takeover statute. It was not disclosed that the same court had dismissed nine of Gerber's eleven claims, that the court had held that Gerber was entitled to no further hearing, and that five days prior to the mailing of the proxy materials Anderson, Clayton had filed an amendment with the state that complied with the court of appeals ruling.

(9) At the annual meeting of Gerber stockholders—to which the proxy statement was related—the existing board was re-elected and was thus able to continue its opposition to proposed tender offers in disregard of the interests of Gerber stockholders.

(10) In a press release containing excerpts from defendant Suerth's speech to the annual meeting it was not disclosed that Goldman Sachs, Gerber's investment banker and intimately familiar with Gerber's financial affairs, considered the offer "substantial," but rather it was stated that some unidentified Wall Street banking interests regarded $40 as substantial and generous while others did not consider it a fair price.

Section 14(e) provides in relevant part as follows:

> It shall be unlawful for any person to make an untrue statement of a material fact or omit to state any material fact necessary in order to make the statement made, in the light of all the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

Among plaintiffs' allegations of defendants' misconduct, numbers (3), (5), (6), (7), (8), and (10) fall within that part of the section dealing with misrepresentations or omissions while the remaining allegations deal with alleged fraudulent, deceptive or manipulative acts or practices. I shall deal with the latter category first.

Allegations (1) and (2) are both concerned with the board's failure to entertain inquiries from outside corporations regarding potential acquisition of controlling interests in Gerber. It is not averred that any of the inquiries reached the stage of firm proposals for tender offers or any other type of acquisition. Accordingly, any actions by the board with respect to those inquiries cannot be said to be "in connection with" a tender offer as is required in order

for § 14(e) to be applicable. Nor would those actions be "in connection with" the proposed Anderson, Clayton tender offer. It is well settled that statements made by either the offeror or the target company prior to the actual effective date of a tender offer but after the announcement of the offer and preliminary filings fall within the purview of § 14(e). *See, e. g., Applied Digital Data Systems, Inc. v. Milgo Electronic Corp.,* 425 F.Supp. 1145, 1152 (S.D.N.Y.1977); *Anaconda Co. v. Crane Co.,* 411 F.Supp. 1210, 1215 (S.D.N.Y.1975); *ICM Realty v. Cabot, Cabot & Forbes Land Trust,* 378 F.Supp. 918, 921–22 (S.D.N.Y.1974). During this interim period the policies behind § 14(e) apply with as much force as they do following the effective date of the offer. Gerber's responses to the types of inquiries involved here, however, were not connected in any substantial fashion with the Anderson, Clayton offer. While the inquiries might have been motivated by the existing proposed offer, and the board's reaction somehow influenced by the Anderson, Clayton experience, the requisite connection is not present. Moreover, because such overtures were not firm offers they should not be deemed material information required to be disclosed under § 14(e). *See Scott v. Multi-Amp Corp.,* 386 F.Supp. 44, 65 (D.N.J.1974). See generally pp. 1321–1322, *infra.* "Parties are not required to disclose plans which are contingent or indefinite." *Missouri Portland Cement Co. v. H. K. Porter Co.,* 535 F.2d 388, 398 (8th Cir. 1976). *See Susquehanna Corp. v. Pan American Sulphur Co.,* 423 F.2d 1075, 1084–85 (5th Cir. 1970).

■ Allegations (4) and (9) are both premised on the contention that the board's actions in opposition to the Anderson, Clayton proposed tender offer and other potential acquisitions were not motivated by legitimate business concerns and were contrary to the best interests of Gerber shareholders. In short, plaintiffs are claiming here—as well as in the preceding allegations albeit in a less direct manner—that the board violated its fiduciary duty to Gerber shareholders by attempting to block the Anderson, Clayton proposed offer and refusing to negotiate with other companies. As defendants have vigorously argued, however, claims such as this are no longer cognizable under the anti-fraud provisions of the federal securities laws after *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). The Supreme Court held in *Green* that a breach of fiduciary duty without any deception, misrepresentation, or nondisclosure does not violate § 10(b) or Rule 10b–5. It has since been held that "given the similarity of purpose of [§§ 10(b) and 14(e)]" the same limitation would apply in the tender offer context. *Altman v. Knight,* 431 F.Supp. 309, 314 (S.D.N.Y.1977).

■ I conclude as a matter of law that none of the contentions discussed thus far involves sufficient allegations of deception to state a claim under § 14(e). In none do plaintiffs argue that they were deceived with respect to the terms or facts of the Anderson, Clayton offer. The full disclosure requirements of § 14(e) do not reach to corporate activities unrelated to the tender offer in question nor do they require a target company that opposes an offer "to characterize conflict of interest transactions with pejorative nouns or adjectives." *Goldberg v. Meridor,* 567 F.2d 209, 218 n.8 (2d Cir. 1977). "Even under the most narrow reading of *Green,* an allegation of deception must allege more than a mere failure to disclose 'unfairness' of a transaction." *Goldberger v. Baker,* 442 F.Supp. 659, 664 (S.D.N.Y.1977). While actions of a board of directors or corporate officers might constitute internal mismanagement and breach of fiduciary duty even without deception, it is just such claims that are excluded from the purview of § 14(e) according to the standards set forth in *Green.*

■ Even were plaintiffs' claims in this regard cognizable under § 14(e), the facts of this case indicate that the board did not violate its fiduciary duty to Gerber shareholders with respect to the issue that is the crux of this aspect of plaintiffs' complaint—the bringing of the action against Anderson, Clayton to halt the tender offer.

Gerber had filed its complaint against Anderson, Clayton on the same day that the April 25 press release was made public. The corporation was under no obligation to include the allegations made in the complaint in its press release. Under current law Gerber had standing to bring the action, filed its complaint in good faith, and alleged violations of federal securities and antitrust laws. That a sufficient factual basis existed is amply demonstrated in the record of that case. There was never any contention by Anderson, Clayton that Gerber's action was an abuse of process. Indeed, even had Gerber's allegations been rejected it could not be said that they were frivolous.

■ There can be no doubt that corporate officers and directors have a high fiduciary duty of honesty and fair dealing with shareholders. Under the applicable Michigan law, it is clearly recognized that directors and officers are fiduciaries, and their dealings with the corporation and its stockholders are rigorously scrutinized. *See, e. g., Thomas v. Satfield Co.,* 363 Mich. 111, 108 N.W.2d 907 (1961). Nevertheless, it is also well established that corporate management may not be held liable for good faith errors in judgment. The so-called "business judgment rule" leaves relatively wide discretion in management to act in what it considers to be the best interests of the corporation.

As stated in my order bifurcating Gerber's case against Anderson, Clayton, there existed from the start serious questions with respect to full and fair disclosure by Anderson, Clayton under the Securities Exchange Act of 1934, as amended by the Williams Act. The factual history of this case, set forth above, indicates that the principal dispute between Gerber and Anderson, Clayton centered around the extent of the disclosure required in connection with Anderson, Clayton's foreign payments operation. Anderson, Clayton resisted full disclosure throughout every stage of the proceedings. At the discovery stage it was argued that revelation of the identities and locations of corporate officials residing abroad who were involved in the "sensitive payments" scheme would expose them to a risk of personal or economic injury. Anomalously, at the same time the corporation was taking this position, a member of its board of directors publicly disclosed, in another context, the countries involved in the operation. Moreover, Anderson, Clayton failed to disclose not only the identities of those officials residing abroad who were aware of the payments, but also those residing in the United States. That Gerber's opposition to the tender offer on securities law grounds was not frivolous or based on trumped-up charges is apparent from an examination of both the legislative history of the Williams Act and the materiality of the facts withheld.

1. Legislative Intent

■ It has been stated that "[t]he primary purpose of Congress in adopting the Williams Act was to ensure that the public shareholder confronted with a tender or exchange offer would be provided with complete and truthful information about the offeror, the terms and probable consequences of the offer and the interests and qualifications of any person recommending acceptance or rejection of an offer." *Applied Digital Data Systems v. Milgo Electronic,* 425 F.Supp. 1145, 1152 (S.D.N.Y. 1977). *See Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). That such an appraisal is accurate is clearly illustrated by the legislative history of the Williams Act. As indicated by Senator Kuchel, co-author of the Act, before the Act's passage in 1968, "unidentified persons may secretly attempt to gain control of a major American corporation. Individuals making a cash tender offer are free to operate in almost complete secrecy concerning their intentions, their commitments, and even their identities. *Such secrecy in this essential area is totally inconsistent with the disclosure pattern generally prevailing in the American securities market.*" 113 *Cong.Rec.* 9338 (remarks of Senator Kuchel) (emphasis added). It was the goal of the Williams Act to prohibit such secrecy. It was felt that in a tender

offer situation the stockholders of the target corporation should have complete information concerning the persons seeking to assume control.

Senator Kuchel recognized that undisclosed principals seeking to purchase another corporation "may indeed have the best interests of the corporation at heart. Their identities and their intentions may further be acceptable to the . . . stockholders who desire to accept the offer and sell their shares. *But such vital information regarding the competence and integrity of the purchasers is not available. The investment decision must be based solely on rumor, conjecture, and a market price; a decision which may preserve or doom the corporation itself.*" *Id.* at 9338–39 (emphasis added). This, then, was the problem the Act sought to remedy.

Senator Kuchel noted further that,

It can be argued that a cash tender offer is a straightforward business proposition which may be rejected by a stockholder or accepted by him, usually at a price in excess of the market price. *But where no information is known about the prospective purchasers or their plans, the stockholder may be ignorantly participating in the rape of the corporation.* . . . [The Williams Act] is an effort to provide the American stockholder with the information he needs to make a sound investment decision. *Secretive and mysterious transactions . . . must not be allowed to guide the future of any corporation.* The Securities Act of 1933 and the Securities Exchange Act of 1934 are impressive testimonials that full disclosure is not an impediment, but an aid to legitimate business transactions.

*This proposal . . . will allow all to stand on an equal footing with respect to the availability of significant facts about a tender offer or a corporate stock purchase program.* It is legislation which I believe will protect the investor, and the public interest, and will encourage honest and fair transactions in this Nation's securities markets. *Id.* (emphasis added).

The comments of the Act's principal author, Senator Williams, are especially enlightening. He demonstrated the problems which exemplified the need for regulation of tender offers:

Today, the public stockholder in deciding whether to reject or accept a tender offer possesses limited information. No matter what he does, he acts without adequate knowledge to enable him to decide rationally what is the best course of action. This is precisely the dilemma which our securities laws are designed to prevent.

*The competence and integrity of a company's management, and of the persons who seek management positions, are of vital importance to stockholders. Secrecy in this area is inconsistent with the expectations of investors and impairs public confidence in our Nation's securities markets . . . .*

In reporting this bill, the committee has carefully weighed both the advantages and disadvantages to the public of the cash tender offer. We have taken extreme care to avoid tipping the scales either in favor of management or in favor of the person making the take-over bids. *[The Act] is designed solely to require full and fair disclosure for the benefit of investors. The bill will at the same time provide the offeror and management equal opportunity to present their cases.*

*While the bill may discourage tender offers or other attempts to acquire control by those who are unwilling to expose themselves to the light of disclosure, this is but a small price to pay for adequate investor protection.* Experience under the Securities Act of 1933 and the Securities Exchange Act of 1934 has amply demonstrated that the disclosure requirements of the Federal securities acts are an aid to legitimate business actions, not a hindrance. . . . Legitimate businessmen certainly have nothing to fear from full disclosure on cash tender offers. *The stockholders have a right to know who they are dealing with, what commitments have been made, and the intentions and plans of the offeror. So does*

*the public.* 113 *Cong.Rec.* 24662–66 (remarks of Senator Williams) (emphasis added).

In reporting on the Senate bill, the House Committee on Interstate and Foreign Commerce reiterated the comments made by Senators Williams and Kuchel.

As noted by the authors of the Williams Act, the requirement of full disclosure is at the very heart of all the federal securities laws. *See also Santa Fe Industries, Inc. v. Green, supra,* 430 U.S. at 477–78, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (". . . the Court repeatedly has described the 'fundamental purpose' of the [1934] act as implementing a 'philosophy of full disclosure' . . . ."); *Feit v. Leasco Data Processing Equip. Corp.,* 332 F.Supp. 544, 563 (E.D.N. Y.1971) ("The keystone of the Securities Act of 1933, and of the entire legislative scheme of the securities laws, is disclosure.") The legislative history of the Securities Exchange Act of 1934 clearly indicates the significance of full disclosure. In House Report No. 1383 it was stated:

*No investor, no speculator, can safely buy or sell securities upon the exchanges without an intelligent basis for forming his judgment as to the value of the securities he buys or sells.* The idea of a free and open public market is built upon the theory that competing judgments of buyers and sellers as to the fair price of a security brings about a situation where the market price reflects as nearly as possible a just price. *Just as artificial manipulation tends to upset the true function of an open market, so can the hiding and secreting of important information obstruct the operation of the markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy.* . . . Delayed, inaccurate, and misleading reports are the tools of the unconscionable market operator and the recreant corporate official who speculate on inside information. 78 *Cong.Rec.* 7704–05.

One of the most critical reasons for full disclosure lies in the necessity of insuring to the greatest possible extent the competence and integrity of management. As noted above, such a goal was recognized in the history of the Williams Act. It was also recognized by the Congress in passing the 1934 Securities Exchange Act as evidenced by the following remarks:

This bill, although it is called a bill to regulate national securities exchanges, is much broader in its practical operation. In fact, the object of this measure is not merely to regulate the exchanges—that is only incidental to its purpose. The real purpose of this regulatory measure is to protect the investors of the United States against fraud and imprudent investments, and to give integrity to the securities by the sale of which American business must be financed. . . .

*The question of the integrity of the management of the corporation is involved; the question of the prudence of the investment represented by the stock is involved.* . . .

We do not mean that the Federal Government will attempt to substitute its judgment for the judgment of the stockholder in the matter of determining prudence of the investment. That is a problem which the Government does not try to relieve him; but it is the problem of the Federal Government under the theory of this bill to require that when the corporation registers its stock on an exchange it must make a *full and complete revelation of all facts that legitimately affect its securities.* 78 *Cong.Rec.* 7861–62 (emphasis added).

2. Materiality

Thus it is clear that both the letter and the spirit of the securities laws call for complete and unrestricted disclosure. Disclosure is only required, however, of material facts. The question therefore becomes, what is meant by the term "material."

Materiality is an "elusive concept." *SEC v. Bausch & Lomb, Inc.,* 420 F.Supp. 1226, 1233 (S.D.N.Y.1976). "Whether or not any particular fact is material is a determination which clearly cannot be made in a

vacuum. Each individual case must be viewed as a discrete set of circumstances and judged on its own unique facts." *Id.*

The Supreme Court has recently dealt with the definition of materiality. In *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), the Court held: "The general standard of materiality that we think best comports with the policies of Rule 14a–9 is as follows: An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." Although *TSC Industries* was concerned only with the proxy solicitation rules, lower courts have interpreted the Court's materiality standard as applicable to the rest of the securities laws as well, *see, e. g., Wheat v. Hall,* 535 F.2d 874, 876 (5th Cir. 1976), and the Justices are also apparently of that view. *See Piper v. Chris-Craft Indus.,* 430 U.S. 1, 48, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) (Blackmun, J., concurring).

The Sixth Circuit had previously adopted this basic standard. In *Chelsea Assoc. v. Rapanos,* 527 F.2d 1266, 1270 (6th Cir. 1975) it was stated:

> This circuit in *Arber v. Essex Wire Corp.,* 490 F.2d 414 (6th Cir.), *cert. denied,* 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974) adopted the objective test of materiality in 10b–5 actions as stated by the Second Circuit in *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir. 1968), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971), a test based upon whether a reasonable man would have attached importance to the undisclosed facts in determining his choice of action in a particular transaction. *Arber v. Essex Wire Corp., supra,* at 418; *Texas Gulf Sulphur, supra* at 849.

Moreover, the Court stated in *TSC Industries* that "such matters are not subject to determination with certainty. Doubts as to the critical nature of information misstated or omitted will be commonplace. And particularly, in view of the prophylactic purpose of the Rule [14a–9] and the fact that the content of the proxy statement is with-in management's control, it is appropriate that these doubts be resolved in favor of those the statute is designed to protect." 426 U.S. at 448, 96 S.Ct. at 2132, 48 L.Ed.2d at 765.

Thus, it is only by "sifting facts and weighing circumstances," *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), that the materiality of any information can be determined. Gerber alleged that the identities and locations of Anderson, Clayton employees working abroad was material yet had been disclosed neither in any of the materials required to be filed by relevant state and federal statutes nor in the proposed tender offer materials to be distributed to Gerber stockholders. Anderson, Clayton responded by contending that such identities and locations were not material facts in light of the disclosure of (1) the foreign payments operation itself, (2) the fact that the corporate books "were not fully descriptive of the transactions", (3) the amount of total payments, and (4) the information that certain unnamed directors and officers of the corporation were aware of the operation. Anderson, Clayton argued that disclosure to this extent sufficiently informed shareholders so that they could make an informed decision, and further description of specific individuals residing abroad who were involved in the operation, and their locations, was not of such a nature that there was a substantial likelihood that a reasonable shareholder would consider it important in deciding whether or not to tender his shares.

As seen in the legislative history discussed above, Congress in enacting the Williams Act clearly intended that information with respect to the integrity of the tender offeror's management be disclosed. The Report of the House Committee which accompanied the Act stated: "The competence and integrity of a company's management, and of the persons who seek management positions, are of vital importance to the stockholder. Secrecy on this area is inconsistent with the expectations of the people who invest in the securities of pub-

licly held corporations and impairs public confidence in securities as a medium of investment." H.R. No. 1711, 90th Cong., 2d Sess., *reprinted in U.S.Code Cong. & Admin.News*, 2811–12 (1968). The authors of the Act were similarly direct in expressing the crucial importance of exposing to public view the corporate activities of managing executives so that their competence and integrity can be evaluated.

In circumstances where actions by some members of corporate management have been challenged as being questionable, if not outright illegal, and such actions have indeed been acknowledged by the corporation itself, it is certainly necessary that stockholders have knowledge of the individuals involved and the activities which transpired in order that they may have a full opportunity to appraise those activities and the participants. Such activities bear the closest relationship to the integrity of management.

The disclosures made by Anderson, Clayton in this case were wholly inadequate with respect to the foreign payments operation. The absence of full disclosure pertaining to Anderson, Clayton's management practices would have made it difficult, if not impossible, for Gerber shareholders to reach an informed decision on the proposed tender offer. In its filings and proposed offer, Anderson, Clayton avoided setting forth the facts of the operation in a simple, straightforward manner. Rather, it sought to camouflage the specific transactions by the continued use of euphemisms, generalizations, and vague, self-serving language that did not enlighten the shareholder about the true nature, scope, and effect of the transactions and of management's involvement therein. Indeed, even the use of the term "sensitive payments" was deceptive. It was of utmost importance for the Gerber stockholders to be cognizant of the identities of the Anderson, Clayton officials who took part in the foreign payments scheme so that a complete understanding of the management's integrity could be possible.

Similarly, the location and timing of the payments was material. Termination of the operation was admitted by Anderson, Clayton to have some adverse effect on sales in the countries where payments had been made. The shareholders should have known whether that adverse effect involved countries in which Anderson, Clayton does a significant amount of its business. Moreover, such knowledge was necessary in order to determine whether Gerber might have operations in the same locations which also could have been adversely effected in the event of a take-over of Gerber by Anderson, Clayton.

Whether disclosure is adequate "must be evaluated by a consideration of the 'total mix' of all information conveyed or available to investors." *Spielman v. General Host Corp.*, 402 F.Supp. 190, 195 (S.D.N.Y.1975). Anderson, Clayton's disclosure regarding the foreign payments was patently insufficient. The information concerning identities of individuals, their locations and the timing of payments was important to stockholders, and was material.

Gerber thus had legitimate concerns upon which it could base its claims in the action brought in this court. Far from violating the fiduciary duty imposed upon them, Gerber's directors were seeking protection of a statutorily established right. It has been noted, moreover, that corporate management has an affirmative duty not to refrain from bringing actions under circumstances like those present here, but to "oppose offers which, in its best judgment, are detrimental to the company or its stockholders." *Northwest Indus., Inc. v. B. F. Goodrich Co.*, 301 F.Supp. 706, 712 (N.D.Ill.1969). *See* E. Aranow, H. Einhorn & G. Berlstein, *Developments in Tender Offers for Corporate Control* 79 & n. 195 (1977).

Turning now to the allegations dealing with misrepresentation and omissions, I must address initially defendants' contention that irrespective of the merits plaintiffs' claims must fail for lack of causation. There is no question that causation in fact is an essential element of a private cause of action brought under § 14(e), just

as it is for Rule 10b–5 actions. *Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 696 (2d Cir. 1973). *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Fridrich v. Bradford*, 542 F.2d 307, 318 (6th Cir. 1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 769 (1977). *See generally*, E. Aranow, H. Einhorn & G. Berlstein, *Developments in Tender Offers for Corporate Control* 122 (1977). In order to prevail, a plaintiff must demonstrate a causal nexus between the defendants' wrongful conduct and his loss. As has been noted, "[t]he roots of the causation in fact requirement have been the subject of much disharmony. Causation has been most often analyzed in terms of . . . materiality or reliance." *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 562 F.2d 1040, 1048 (8th Cir. 1977). The distinction between materiality and reliance is one of degree. *Chelsea Assoc. v. Rapanos*, 527 F.2d 1266, 1271 n. 2 (6th Cir. 1975). The inquiry as to materiality in the tender offer context is whether there exists a substantial likelihood that a reasonable shareholder would consider a particular fact important in deciding what to do with his stock. See text at p. 1321, *supra*. The element of reliance essentially concerns whether the misrepresentation or omission actually induced the plaintiff himself to act differently than he would have acted in his investment decision.

 In general a plaintiff must demonstrate both materiality and reliance in securities fraud cases. The violations alleged by plaintiffs here, however, arise from nondisclosure of material facts. In such situations the Supreme Court has held that "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. . . . *This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact."* *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741

(1972). *See McCloskey v. Epko Shoes, Inc.*, 391 F.Supp. 1279, 1282–83 (E.D.Pa.1975). This case parallels *Affiliated Ute* in the sense that the fiduciary relationship between the board of directors and Gerber stockholders corresponds with the quasi-fiduciary relationship that existed in *Affiliated Ute* between the defendant bank employees and the plaintiff Indians. Consequently the holding by the Sixth Circuit Court of Appeals in *Fridrich v. Bradford*, 542 F.2d 307 (6th Cir. 1976), that *Affiliated Ute* does not control in cases involving impersonal market transactions is inapplicable to the facts here.

Defendants contend that causation is lacking because plaintiffs' loss resulted from the withdrawal of the tender offer, which was caused not by any of Gerber's actions, but rather by Anderson, Clayton's failure to disclose sufficient information regarding its so-called "sensitive payments." (See discussion of this issue, *supra*.) Moreover, defendants argue, plaintiffs have not claimed, indeed they could not claim in light of the withdrawal of the offer prior to its effective date, that shareholders were induced to forego an opportunity to tender their shares due to defendants' misrepresentations or omissions. Defendants have thus attempted to demonstrate "that there was clearly no reliance, that is, that even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was, [thus] the non-disclosure cannot be said to have caused the subsequent loss and under the ordinary principles of the law of fraud, recovery should be denied." *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974). If a defendant makes such a showing in a nondisclosure case, the rule in the Sixth Circuit is that the *Affiliated Ute* presumption of reliance does not apply. *Chelsea Assoc. v. Rapanos*, 527 F.2d 1266, 1271–72 (6th Cir. 1975).

 It is true that plaintiffs' loss did not result from their failure to tender their shares. It is also true that plaintiffs have not contended that defendants' alleged non-

disclosures prompted the withdrawal of the Anderson, Clayton offer. Plaintiffs have asserted that defendants caused the withdrawal by instituting and prosecuting litigation against Anderson, Clayton, but I have already held that that action was valid and not unlawful. The requisite causation does exist, however, to the extent that plaintiffs were misled into retaining their holdings when they could have sold them on the market at a higher price. The legislative history of the Williams Act indicates that the legislation was intended to reach such transactions as well as those involving the actual tender of a stockholder's shares. *See* S.Rep. No. 550, 90th Cong., 1st Sess., at 2 (1967). Plaintiffs' complaint is broad enough to permit the inference, at least in the alternative, that they suffered a loss of this type. It does not appear that any of the named plaintiffs in these consolidated cases sold their stock between the time of the announcement of the Anderson, Clayton proposal and its withdrawal. During the period following the announcement the market price of Gerber stock climbed to a high of over 37. As noted above, the price dropped to approximately 28 the day after the withdrawal, and later reached a twelve-month low of 25¾. If defendants misrepresented or omitted material facts in connection with their opposition to the Anderson, Clayton proposal so that plaintiffs were induced to retain their shares in reliance upon the integrity and good judgment of the board of directors, but had they known the truth they would have sold their stock in the rising market, a direct causative link exists between defendants' acts and plaintiffs' investment decision. In short, defendants' efforts with respect to the causation issue have focused exclusively on the shareholders' decision to tender their shares, and are, therefore, unsuccessful in rebutting the presumption of reliance as it relates to the shareholders' decision to sell on the open market.

Returning to plaintiffs' allegations, number (3) implies that the board's failure to disclose Goldman Sachs' opinion that the $40 offer was substantial in and of itself constituted a violation of § 14(e), irrespective of any public statements released by Gerber. It has been held that a target corporation violates § 14(e) if it states that the offering price is inadequate but fails to disclose that it has received an opinion from its financial advisor that the price is fair and equitable. *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 364–65 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 232, 38 L.Ed.2d 148 (1973). *See Emhart Corp. v. USM Corp.*, 403 F.Supp. 660, 662–63 (D.Mass.), *vacated on other grounds*, 527 F.2d 177 (1st Cir. 1975). On the other hand, a target's statement that the offering price was inadequate because it was less than the book value of the stock has been found not to violate § 14(e). *Emhart, supra*. Similarly, no violation of the section was found where a press release issued by the target company's board indicated that the offering price was inadequate but failed to state the basis for such a conclusion. *Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 356 F.Supp. 1066, 1071 (S.D.N.Y.), *aff'd*, 476 F.2d 687 (2d Cir. 1973).

Although the first clause of § 14(e) does not deal with total nondisclosure, and the equivalent language in Rule 10b–5 has been interpreted to refer only to affirmative misrepresentations and half truths, *see* III L. Loss, *Securities Regulation* 1439 (1961); 1 A. Bromberg, *Securities Law: Fraud, SEC Rule 10b–5* § 2.6(2) (1977), it is well established that nondisclosure alone may be deemed fraudulent or deceptive as those terms are used in the second clause of § 14(e). *See, e. g., List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir.), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); *SEC v. Texas Gulf Sulpher Co.*, 258 F.Supp. 262, 277 (S.D.N.Y. 1966). It is true that in general the Williams Act does not appear to impose upon the management of a target company an affirmative duty to respond to a tender offer at all. *See A & K R. R. Materials, Inc. v. Green Bay & W. R. R. Co.*, 437 F.Supp. 636, 644 (E.D.Wis.1977). Once the target does decide to respond, however, it assumes the responsibility of disclosing relevant information. *Cf.* E. Aranow, H. Ein-

horn & G. Berlstein, *Developments in Tender Offers for Corporate Control* 79–80 (1977).

It is equally clear, however, that the omission must be of a material fact. As noted above, the standard for materiality established by the Supreme Court in *TSC Industries* requires a showing that there is a substantial likelihood that a reasonable shareholder would consider the information significant in making his investment decision. The decision with which we are concerned here is one of whether to sell on the market or retain one's stock. The opinion of Goldman Sachs as to the sufficiency of the tender offer price would have no relationship to a decision to sell or retain. A shareholder faced with that decision would be interested in the market price of the stock on the one hand and the validity of Gerber's opposition to the tender offer on the other.

In allegation (5) plaintiffs allege that the April 25 press release, in which it was announced that the board recommended rejection of the Anderson, Clayton tender offer as not being in the "best interest of the Company and its stockholders," failed to disclose: (a) why the tender offer was not in the stockholders' best interest in light of the fact that the offering price of $40 per share represented a substantial premium over the market price; (b) the opinion of Gerber's retained investment firm, Goldman Sachs, as to the fairness and adequacy of the proposed tender; (c) whether the board considered $40 a fair price for the stock irrespective of other reasons for recommending rejection of the offer; (d) that the proposed offer constituted a substantial premium over the market price for Gerber stock; (e) that Gerber's last two quarters' earnings were less than the earnings for the comparable quarter in prior years; (f) that it was anticipated that earnings for the first quarter of the 1978 fiscal year would be disappointing.

With respect to allegation (a), the short answer seems to be that it is simply unfounded. Gerber stated in the press release that there were possible antitrust and securities problems with the acquisition. These are certainly sufficient reasons for a conclusion that the shareholders' best interests would not be served. Plaintiffs cannot allege that a material omission occurred with respect to the offering price since the April 25 release expressly referred to the $40 per share.

I recognize and fully support the policy that "corporate officers and directors in their relations with shareholders owe a high fiduciary duty of honesty and fair dealing. . . . By reason of the special relationship between them, shareholders are likely to rely heavily upon the representations of corporate insiders when the shareholders find themselves in the midst of a battle for control." *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 364 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 232, 38 L.Ed.2d 148 (1973). *See also Cauble v. White,* 360 F.Supp. 1021, 1029 (E.D.La. 1973). It is clear to me here, however, that no misrepresentation occurred. In light of the strength of Gerber's allegations, on their face, of violations of federal law, "a businessman could make a proper business judgment . . . to recommend rejection of the [Anderson, Clayton] offer." *Anaconda Co. v. Crane Co., supra,* at 1215.

The *Chris-Craft* case presents a factual situation analogous to the one we have here. Chris-Craft Industries proposed a cash tender offer for shares of Piper Aircraft. In a series of communications to Piper shareholders, Piper management stated that the board of directors had "carefully studied [the] offer and is convinced that it is inadequate and not in the best interests of Piper's shareholders." Chris-Craft contended that a reasonable shareholder would have assumed that "inadequate" referred to price, and that the communications were therefore misleading since the offering price considerably exceeded the market price of Piper stock. In reversing the district court the Court of Appeals for the Second Circuit held that the reference to "inadequate" did in fact imply that the offering price was too low and was violative of § 14(e) as a materially misleading statement.

It is critical to recognize that the attack in *Chris-Craft* was directed at the reference to the offer's inadequacy and not to the statement that the offer was not in the shareholders' best interests. That distinguishes *Chris-Craft* from this case. Nowhere in any press release did Gerber state that the offering price was inadequate. The release of April 25 simply stated that Gerber would oppose the proposal as not being in the best interests of the company and its stockholders. The release included reference to the offering price, and made no suggestion that it did not reflect a fair value of Gerber common stock. As noted above, other factors were sufficient to warrant a judgment that the offer should be opposed.

Allegation (5)(b) again raises the issue of whether the target is required to disclose the opinion of its investment banker that the offering price is fair and substantial. I concluded above that such information was not material under the facts of this case. In this context, moreover, it is equally obvious that the failure to make reference to the opinion in the April 25 press release did not make the statements included therein misleading. This is not a case like *Chris-Craft, supra,* in which the release included the board's opinion that the offering price was inadequate. Nowhere in the April 25 statement is it even implied that the board considered the $40 per share inadequate. The emphasis of the release is upon the potential unlawfulness of the offer under the securities and antitrust laws. Under these facts it simply cannot be said that the omission of the Goldman Sachs opinion makes the press release misleading.

Even though the board did not contend in the release that the offering price was inadequate, plaintiffs allege in (5)(c) that the failure to include the board's own views on the fairness of the price constituted a violation of § 14(e). This argument borders on the frivolous. The omission of the board's opinion of the offering price did not make any of the other statements misleading. Indeed, it may be inferred that by failing to include a state-ment that the price was considered inadequate, the board tacitly indicated its view that the price was not too low. Additionally, the board's views would merely constitute opinions, not facts, and it is only the latter that are required to be disclosed under § 14(e), except in unusual situations. 3 A. Bromberg, *Securities Law: Fraud, SEC Rule 10b–5* § 8.2 (1977).

Allegation (5)(d) is also meritless. Initially it may be said that the omission did not make anything stated in the release misleading insofar as there was no reference to the adequacy or inadequacy of the price. More fundamentally, however, plaintiffs cannot complain merely because Gerber did not re-emphasize facts that might have been helpful to Anderson, Clayton in its tender offer "although such facts would have been known to the ordinary investor in [Gerber] either through the company's annual and quarterly statements or through papers of general circulation. For example it is assumed that the ordinary investor would check the market price of his stock on the day before the tender offer before deciding whether to tender his shares." *Gulf & W. Indus., Inc. v. Great A. & P. Tea Co., Inc.,* 356 F.Supp. 1066, 1071 (S.D.N.Y.), aff'd, 476 F.2d 687 (2d Cir. 1973). Moreover, disclosure that the offering price represents a premium over the market price is even less significant with respect to a shareholder's decision to sell in the market or retain his shares. The information does not meet the *TSC Industries* standard for materiality.

Allegations (5)(e) and (5)(f) may be answered very quickly. First, the record indicates that the allegation concerning prior earnings is not true. Second, omission of prior earnings figures made none of the statements included in the press release misleading. As noted above, a target company's duty under § 14(e) is not one of absolute disclosure of all potentially relevant facts about its management, finances, and operations. Rather, the duty is one of disclosure of material facts that are necessary to prevent an investor from being misled. Had the release included a statement

to the effect that the offering price was inadequate, it might have been necessary to disclose information concerning past earnings. *See Emhart Corp. v. USM Corp.,* 403 F.Supp. 660, 662 (D.Mass.1975). In the absence of such a statement, however, disclosure was not required. The materiality standard set forth in *TSC Industries, supra,* contemplates

a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly altered the "total mix" of information made available.*

426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (emphasis added). I conclude that under the facts of this case the information concerning Gerber's earnings during the previous two quarters would have had at best an infinitesimal effect upon a shareholder's decision to sell on the market or retain, and certainly would not meet the *TSC Industries* materiality standard.

■ Neither was Gerber under an obligation to disclose what would have been speculative figures regarding earnings for the first quarter of the 1978 fiscal year. *Cf. Arber v. Essex Wire Corp.,* 490 F.2d 414, 421 (6th Cir. 1974). Failure to include such information contributed in no way toward making the information that was released misleading. Indeed, Gerber would have run a risk of violating § 14(e) or Rule 10b–5 by including such statements. There is no longer any doubt that predictions of earnings figures can be actionable under the securities laws should those predictions prove erroneous. *See, e. g., SEC v. Bausch & Lomb,* 420 F.Supp. 1226 (S.D.N.Y.1976); *Green v. Jonhop, Inc.,* 358 F.Supp. 413 (D.Or.1973) (Rule 10b–5).

Plaintiffs make essentially the same contentions with respect to (a) a letter written to all Gerber stockholders on June 17, 1977 by defendant Suerth, chairman of the board of Gerber Products; (b) a proxy statement

mailed to Gerber stockholders on June 21, 1977; (c) a press release issued on July 27, 1977 containing excerpts from defendant Suerth's speech to the annual meeting of stockholders held on that day. The discussion presented above applies to these allegations as well. It is also averred, however, that the proxy statement was deficient in one additional respect.

■ Plaintiffs argue that the proxy statement was misleading in that it stated that the Michigan Court of Appeals had ruled Anderson, Clayton to be in violation of the state take-over statute disclosure requirements, but omitted the facts that the court had dismissed nine of the eleven claims made by Gerber in its state action, that the court had held that Gerber was entitled to no further hearing, and that Anderson, Clayton had filed an amendment with the Michigan Commerce Department complying with the state court's directive regarding disclosure five days prior to the mailing of the proxy statement to shareholders. Once again, these omissions do not affect any statements made in the proxy materials so that they appear misleading. It matters not that all but one of Gerber's state claims were dismissed if one was upheld. A single violation of the Michigan take-over statute can be condemned as strongly as multiple violations, and that is just what Gerber did in the proxy statement. The statement does not imply that other violations occurred, or that Anderson, Clayton engaged in any other improper activities.

As far as the amendments are concerned, it is evident that filing 5 days prior to the mailing of the proxy statements did not give Gerber sufficient opportunity to include that information in its proxy materials. The statements had undoubtedly been sent to the printer by that time, and it was not necessary for Gerber to incur the additional time and expense of attempting to revise its materials to include that very recent information.

■ It is beyond cavil that it is just as necessary for management of the target corporation to be "meticulous and precise in

their representations to shareholders" as the tender offeror, perhaps more so owing to their fiduciary capacity. *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 365 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 232, 38 L.Ed.2d 148 (1973). Insofar as the investment transaction to which defendants' alleged nondisclosures related was the shareholders' decision to sell in a rising market or retain their shares, and not the decision to tender vel non, the omissions were not material and nothing in defendants' statements can be deemed inaccurate or deceiving for lack of completeness. *See Missouri Portland Cement Co. v. Cargill, Inc.,* 375 F.Supp. 249, 269 (S.D.N.Y. 1974).

■■■ Mindful that the "issue of materiality may be characterized as a mixed question of law and fact, . . .," *TSC Industries, supra,* 426 U.S. at 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757, thus making summary judgment appropriate only if reasonable minds cannot differ on the question of materiality, I conclude that the alleged omissions, "when viewed against the disclosures contained in the proxy statement," *Id.* at 452, 96 S.Ct. 2126, 2134, 48 L.Ed.2d 757, and in the other public releases, were not materially misleading. It thus appears that summary judgment is called for. *See Miller v. Schweickart,* 413 F.Supp. 1062, 1068 (S.D.N.Y.1976). Defendants' motion will be granted with respect to the claims made under the federal securities laws. Plaintiffs' state law claims, over which this court has pendent jurisdiction, must also be dismissed. In *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), the Supreme Court stated that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *See Girard v. 94th St. & Fifth Ave. Corp.,* 530 F.2d 66 (2d Cir.), *cert. denied,* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *Cohen v. Colvin,* 266 F.Supp. 677 (S.D.N.Y.1967). Accordingly, plaintiffs' complaint will be dismissed in its entirety.